IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

| | |
|---|---|
| MATTHEW KEELEY | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No.: 3:24cv158 |
| | ) |
| SHERIFF DAVID R. HINES, | ) |
| Serve:    Hanover County Sheriff's Office | ) |
| 7522 County Complex Rd. | ) |
| Hanover, VA 23069 | ) |
| | ) |
| Defendant. | ) |

## COMPLAINT

Plaintiff Mattheew Keeley, by counsel, states as follows for his Complaint against defendant Sheriff David R. Hines ("Sheriff Hines").

### NATURE OF ACTION

1.      This is an action for wrongful termination under the First and Fourteenth Amendments and for denial of liberty interest rights under the Fourteenth Amendment. Keeley, a former Marine, a recipient of the Navy Achievement Medal (twice), and a former decorated deputy with the Hanover County Sheriff's Office ("HCSO"), was unlawfully fired from the HCSO by Sheriff Hines as a direct result of his outspoken stance that being forced to wear masks in response to COVID-19 violated his rights and beliefs. Indeed, even though other, less vocal, HCSO deputies, refused to wear masks while doing their jobs and suffered no consequences, Sheriff Hines singled Keeley out because of his views and fired him as a result. This was unlawful. Even worse, the Sheriff publicly disparaged Keeley after his termination. This too was unlawful. As such, Keeley now brings this lawsuit against Sheriff Hines to hold him liable for his wrongdoing.

1

## PARTIES

2.      Keeley is an individual resident of Hanover County, Virginia.

3.      Defendant Sheriff David R. Hines is, and at all relevant times has been, the Sheriff of Hanover County and the leader of the Hanover County Sheriff's Office.  At all relevant times herein, Sheriff Hines has been acting under color of law.  He is sued in both his official and individual capacities.

## JURISDICTION AND VENUE

4.      Jurisdiction is conferred on this Court by 28 U.S.C. § 1331 and 28 U.S.C. § 1343.

5.      Venue is proper in this district and division pursuant to 28 U.S.C. § 1391, as this is the district and division where a substantial part of the events or omissions giving rise to the claim occurred.

## FACTUAL BACKGROUND

### A.     KEELEY'S SERVICE TO HIS COUNTRY AND HIS COMMUNITY.

6.      Keeley worked for the HCSO from 2010 through March 3, 2022.  He served in the Uniform Patrol Division for twelve years, was assigned to the HCSO's "High Risk Entry Team" for ten years and worked in the Honor Guard for at least five years.  He was a field training officer, a general instructor, a firearms instructor, and, at the time of his termination, had just completed training to be a driving instructor.

7.      During his time at the HCSO,  Keeley was well-regarded and received several commendations and awards for his work.  Most notably, for an incident that occurred in 2019, Keeley received the Virginia Sheriff's Association Valor Award and the Virginia Association of Chiefs of Police Valor Award.

8.      Keeley's HCSO service followed years of service to his country as a member of the Marine Corps. In the four years immediately prior to joining the HCSO, Keeley, serving as a U.S. Marine, was deployed twice in support of combat operations during Operation Iraqi Freedom, served as a battery commander, and was promoted to the rank of Captain.

**B.      COVID-19, THE HCSO'S MASK POLICY, AND KEELEY'S OUTSPOKEN BUT REASONED OBJECTIONS TO THE POLICY.**

9.      During the latter period of Keeley's employment with the HCSO, the COVID-19 epidemic occurred.

10.      When the pandemic first occurred, an initial recommendation was ***not*** to wear a mask. Not long thereafter, however, health officials began recommending that people ***should*** wear a mask.

11.      For his part, Keeley adhered to the initial recommendation to ***not*** wear a mask, and, as he witnessed the creation and implementation of numerous local, state, and federal mask mandates, he became increasingly skeptical about both the legality and the efficacy of such policies.  Most importantly, Keeley believed that forcing U.S. citizens to wear masks infringed on his personal individual liberty.

12.      In or around the summer of 2020, Sheriff Hines implemented his own mask-wearing policy for the HCSO.  Keeley immediately objected to wearing a mask, made his objection well known at the HCSO, and refused to wear the mask.

13.      Keeley was not shy about his objections to wearing a mask or his reasons for refusing to do so.  He repeatedly told his colleagues and his supervisors (including, when necessary, his shift Lieutenant) that he believed being forced to wear a mask (i) violated his individual liberty rights; (ii) was unconstitutional; (iii) infringed on his religious beliefs (especially his belief that he had a moral duty to object to governmental overreach); and (iv)

improperly forced him to use a medical device under an "Emergency Use Authorization" without his consent.

14.     Keeley also believed that complying with a mask mandate violated his oath of office and his convictions as a Christian.  He was not shy about sharing either of these beliefs as well with his HCSO colleagues and supervisors.

15.     Keeley's statements objecting to wearing a mask also went beyond his own personal situation.  Indeed, Keeley repeatedly told his co-workers and his supervisors at the HCSO that he believed that requiring people to wear masks violated their rights to individual liberty, were unconstitutional, and constituted an improper requirement to wear a medical device under an Emergency Use Authorization without their consent.

16.     Keeley's statements about his beliefs about masks also were not limited to *inside* the HCSO. Instead, he made his views well-known to his friends, family, churchgoers, and others in his community.

## C.     SHERIFF HINES SINGLES-OUT KEELEY BECAUSE OF HIS ANTI-MASK STANCE AND FIRES HIM.

17.     Over the next eighteen months or so, Keeley's decision not to wear a mask was generally accommodated.  While Keeley had a few incidents where his objections were met with resistance (such as at court appearances), he received no discipline and no adverse consequences because of his stance.

18.     To the contrary, in or around January 2021, when Keeley specifically raised the mask policy with Sheriff Hines during a conversation out at the range, Hines told him: "No, no.  We aren't going to fire anybody over a mask!"  In fact, Sheriff Hines expressly assured Keeley in that conversation that he wanted to accommodate people's convictions, including Keeley's.

19.     At the same time, other HCSO employees, including deputies, all of whom were not publicly vocal like Keeley about their objections to wearing masks, chose not to comply with the Sheriff's mask-wearing policy. Upon information and belief, none of these individuals were disciplined in any way, much less terminated.

20.     In late February 2022, however, the HCSO received a complaint about Keeley not wearing a face covering while at the Memorial Regional Medical Center.  At that time, HCSO leadership told Keeley that, *now,* he needed to fully comply with the HCSO mask policy without accommodations or face adverse consequences.

21.     Keeley objected and, as he had done at all times before, clearly articulated his position: (i) that the face covering policy was an abrogation of his personal liberty and constitutional rights; and (ii) that because the mask is a medical device under an emergency use authorization, he had the legal right to refuse to consent to wearing it.  Keeley, at the direction of the HCSO, also wrote a memorandum stating his position that complying with the mask policy conflicted with his conscience.

22.     Keeley was immediately placed on administrative leave, after which he was told by Sheriff Hines that he would be required to comply with the face mask policy (with no accommodations) or be fired.  Keeley reiterated his position and was fired.

23.     Upon information and belief, no other HCSO employees, including deputies, who failed to comply with the HCSO mask-wearing policies were disciplined in any way, much less terminated.  Only Keeley was singled-out for discipline.

**D.     *AFTER* HE TERMINATES KEELEY, SHERIFF HINES PUBLICLY DISPARAGES KEELEY WITH FALSE INSINUATIONS ABOUT WHY HE WAS TERMINATED.**

24.     After Sheriff Hines terminated Keeley, one of Keeley's friends, Mike Harman, wrote an e-mail to Hines asking him to reverse his decision to terminate Keeley.

25.     In his e-mail, which was unsolicited by Keeley, Harman wrote glowing praise about Keeley.  At the same time, he also acknowledged the difficulty that the Sheriff faced in trying to navigate personnel policies in the post-COVID-19 workplace.  As he stated toward the end of his letter:

> I have much respect for you, law enforcement, and the job it entails.  But I deeply believe you got this one wrong, and I strongly request that you reconsider this disproportionate decision and reinstate Matt Keeley back to his deputized status as it was.  In fact, simply based on the fact that ***he is the only one***, he shouldn't be admonished at all, he should be promoted.

(emphasis added).  A true and accurate copy of the e-mail is attached as **Exhibit A**.

26.     A few days later, Sheriff Hines responded to Harman's e-mail with a formal letter on HCSO letterhead.  In the letter, a copy of which is attached as **Exhibit B**, Sheriff Hines purported to speak well of Keeley, saying, for example, that Keeley had "many friends within the Sheriff's Office . . . including me."

27.     Sheriff Hines' kind words, however, were mere faint praise.  Instead, Sheriff Hines went out of his way in his letter to falsely imply that Keeley had been terminated for something much worse than just his stance on masks.  While he professed that he couldn't discuss the details of any personnel actions, Sheriff Hines nevertheless chided Mr. Harman for his alleged lack of knowledge about Keeley, saying: "**you clearly do not know all the details** [pertaining to Keeley's termination]."  *Id.* (emphasis added). Hines then repeated these ominous words when he belittled Harman's praise of Keeley's accomplishments. He stated: "**Once again, I remind you of your statement that you do not know all the details**." *Id.* (emphasis added).

28.     Sheriff Hines closed his letter by implying that he had terminated Keeley for violating his oath as a law enforcement officer.  Mocking Mr. Harman's statement that he [Mr. Harman] had been "Very Concerned" about Keeley's termination, Hines wrote:

> Please know that **I too was very concerned. I also took an oath for the office of Sheriff and have an <u>obligation to the citizens of Hanover County to ensure that all policies, procedures and laws are followed and enforced without due regard to personal or political beliefs.</u> This extends not only to me but <u>to those individuals that have sworn the same</u>**.

**Exhibit B** (emphasis added).

29.     The clear message from these statements was that Keeley was ***not*** following *multiple* policies, procedures, ***and laws*** and was also not following his oath, and thus, he had to be terminated.  It created a far more sinister (and false) picture of the reasons for Keeley's separation than the one painted by the truth.

30.     What is more, Sheriff Hines went out of his way to broadly embarrass and humiliate Keeley with the letter. Not only did Hines send his letter to Mr. Harman, he also sent it – using "cc's" – to his second-in-command (Lt. Col. Woody) and to an Assistant Hanover County Attorney.

31.     In short, Sheriff Hines used his letter to diminish Keeley's reputation in the eyes of others so that he, himself, could look good.

32.     No law, policy, or internal procedure required Sheriff Hines to respond to Mr. Harman's initial e-mail.  He did this of his own volition, and, as stated, he did so in order to minimize the criticism of his termination decision by falsely exaggerating the circumstances under which Keeley had been terminated.

33.     Sheriff Hines did not consult Keeley before he sent his letter, and Keeley had no opportunity to challenge anything in the letter before it was sent out.

**E.     DAMAGES.**

34.     As a result of Sheriff's Hines' actions, Keeley has suffered substantial damages, including a loss of income and reputational damage.

**COUNT I:**
**FIRST AMENDMENT RETALIATION**

35.    The allegations of paragraphs 1-34 are realleged as if fully set forth herein.

36.    Keeley engaged in protected activities under 42 U.S.C. § 1983 ("Section 1983") (through the Fourteenth Amendment of the Constitution) when he exercised his rights under the First Amendment of the Constitution to vocally oppose (i) Sheriff Hines' mask-wearing policy – internally and externally -- on numerous grounds, including that it was unconstitutional, that it violated his liberty, that it violated his religious convictions, and that it was a non-consensual mask mandate involving a medical device approved for emergency use authorization; and (ii) mask-wearing policies in general, on many of the same grounds.

37.    Sheriff Hines was well aware of Keeley's protected activities and/or believed that Keeley had engaged in such protected activities, and was well aware that any retaliation based on Keeley's protected activities would violate his rights under clearly established law.

38.    Notwithstanding this awareness, Sheriff Hines violated Keeley's rights under the First Amendment when he terminated him based on his protected activities – that is, they terminated him, in whole or in part, because of his vocal and outspoken opposition to Hines' mask-wearing policy.

39.    Sheriff Hines acted with malicious intent to deprive Keeley of his First Amendment rights, as secured under Section 1983, and to do him injury.

40.    As a direct result of the actions of Sheriff Hines, in violation of the rights secured to Keeley under Section 1983, Keeley has been caused to suffer the loss of work, income, and the benefits and compensation associated therewith. Additionally, Keeley

has been caused to suffer personal injury, anxiety, emotional distress, personal and professional humiliation and embarrassment as a result of Hines' actions.

41.     Further, Sheriff Hines' actions constitute gross, wanton, malicious, reckless and/or intentional violations of Keeley's rights, thus entitling him to punitive damages.

## COUNT II:
### EQUAL PROTECTION VIOLATION

42.     The allegations of paragraphs 1-41 are realleged as if fully set forth herein.

43.     Under the Fourteenth Amendment's Equal Protection Clause, Keeley is entitled to be treated the same as all similarly situated persons under the law.

44.     Here, however, Sheriff Hines violated the Equal Protection Clause because he (i) treated Keeley, who refused to wear a mask and was outspoken about it, differently than his fellow HCSO employees who refused to wear a mask **but** were *not* vocal about their refusal.  This singling-out was done intentionally by Sheriff Hines, who purposefully discriminated against Keeley because of his outspokenness. This disparity was not justified by any governmental or legitimate interests, because Sheriff Hines repeatedly accommodated those who refused to wear masks but were quiet about it and repeatedly turned a blind eye to strict enforcement of the policy.

45.     As a direct result of the actions of Hines, in violation of the rights secured to him under  Section 1983, Keeley has been caused to suffer the loss of occupational opportunities and the compensation and benefits associated therewith.  Additionally, Keeley has been caused to suffer personal injury, reputational harm, anxiety, emotional distress, personal humiliation and embarrassment as a result of Sheriff Hines' actions.

46.     Further, Sheriff Hines' actions constitute gross, wanton, malicious, reckless, and/or intentional violations of Keeley's rights, thus entitling him to punitive damages.

## COUNT III:
### DUE PROCESS VIOLATION: PROPERTY INTEREST

47.     The allegations of paragraphs 1-46 are realleged as if fully set forth herein.

48.     Under the Fourteenth Amendment, Keeley has a property interest with respect to his former position as a HCSO deputy.

49.     Here, Sheriff Hines deprived Keeley of his property interest without due process when it terminated him without giving him an opportunity to explain that he should be treated the same as those HCSO employees who were not vocal about their opposition to wearing masks.

50.     As a direct result of the actions of Sheriff Hines, in violation of the rights secured to him under Section 1983, Keeley has been caused to suffer the loss of occupational opportunities and the compensation and benefits associated therewith. Additionally, Keeley has been caused to suffer personal injury, reputational harm, anxiety, emotional distress, personal humiliation and embarrassment as a result of Sheriff Hines' actions.

51.     Further, Sheriff's Hines' actions constitute gross, wanton, malicious, reckless, and/or intentional violations of Keeley's rights, thus entitling him to punitive damages.

## COUNT IV:
### DUE PROCESS VIOLATION: LIBERTY INTEREST

52.     The allegations of paragraphs 1-51 are realleged as if fully set forth herein.

53.     Under the Fourteenth Amendment, Keeley has a liberty interest to engage in the commonplace occupations of his life and with respect to his good name, reputation, honor, and integrity.

54.     Here, Sheriff Hines violated Keeley's liberty interests by (i) falsely implying (in **Exhibit B**), in conjunction with Keeley's termination, that Keeley had violated multiple policies, procedures and laws *and* his oath as a law enforcement officer and that these instances of alleged misconduct led to his termination; and (ii) falsely implying (by telling Mr. Harman in **Exhibit B** that he did not "know all the details" about Keeley's termination) that something sinister had led to Keeley's termination, when nothing of the sort was true.  These false statements and implications undermine Keeley's credibility, integrity, and honesty as a law enforcement officer.

55.     These false accusations impugn Keeley's good name, honor, reputation, and integrity, thus causing a stigma to his reputation, and were made in connection with his termination of employment at the HCSO.

56.     Additionally, the false statements at issue were made public to, among others, Mr. Harman, Lt. Col. Woody, and the Hanover County Attorney's Office.

57.     As a direct result of the actions of Sheriff Hines, in violation of the rights secured to him under Section 1983, Keeley has been caused to suffer the loss of occupational opportunities and the compensation and benefits associated therewith. Additionally, Keeley has been caused to suffer personal injury, reputational harm, anxiety, emotional distress, personal humiliation and embarrassment as a result of Sheriff Hines' actions.

58.     Further, Sheriff Hines' actions constitute gross, wanton, malicious, reckless, and/or intentional violations of Keeley's rights, thus entitling him to punitive damages.

59.     Finally, Keeley was not given proper due process as to the false allegations against him, and further, the negative public comments at issue in this Count irreparably

11

poisoned the perception about Keeley to such a degree that any type of name-clearing hearing or post-deprivation remedy would have been futile or worthless.

WHEREFORE, Plaintiff requests this Honorable Court to:

a. Accept jurisdiction of this case;

b. Award Plaintiff compensatory damages against Defendants for the humiliation, mental and emotional distress, and pain and suffering that he has experienced and endured as a result of the unlawful actions of Defendants towards him, as well as damages for all recoverable lost and future wages. Such damages shall be in an amount not to exceed FIVE HUNDRED THOUSAND ($500,000.00), the exact amount to be determined at trial;

c. Award Plaintiff punitive damages against Defendants in an amount not to exceed FIVE HUNDRED THOUSAND DOLLARS ($500,000.00), the exact amount to be determined at trial;

d. Grant Plaintiff pre-judgment and post-judgment interest on all damages awarded, to the maximum extent allowed by law;

e. Grant Plaintiff his attorney's fees and costs; and

f. Grant such other and further relief as to the Court seems just and proper.

**A TRIAL BY JURY IS DEMANDED**.

MATTHEW KEELEY

By:   <u>/s/Richard F. Hawkins, III</u>
       Richard F. Hawkins, III
       Virginia Bar Number: 40666
       THE HAWKINS LAW FIRM, PC
       2222 Monument Avenue
       Richmond, Virginia 23220
       (804) 308-3040 (telephone)
       (804) 308-3132 (facsimile)
       Email: rhawkins@thehawkinslawfirmpc.com

       Counsel for Plaintiff