IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

MATTHEW KEELEY,

     Plaintiff,

v.                                Civil Action No. 3:24-cv-158

SHERIFF DAVID R. HINES,

     Defendant.

## MEMORANDUM OPINION

This matter is before the Court on the DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (ECF No. 31) (the "MOTION"), the Defendant's MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (ECF No. 32), the PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (ECF No. 36), and the Defendant's REPLY BRIEF IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (ECF No. 38). Having reviewed the papers and for the reasons set forth below, the MOTION will be GRANTED and COUNTS I and IV will be dismissed and, because COUNTS II and III have previously been dismissed, the action will be dismissed with judgment in favor of the Defendant.

## BACKGROUND

### I. Procedural History

On March 4, 2024, Matthew Keeley ("Plaintiff" or "Keeley")

filed the COMPLAINT (ECF No. 1), pursuant to 42 U.S.C. § 1983,[1] seeking judgment against Hanover County Sheriff David R. Hines ("Defendant" or "Sheriff Hines") for violation of Keeley's rights under the First and Fourteenth Amendment to the United States Constitution. Plaintiff raised four (4) counts in his COMPLAINT. COUNT I alleges that Sheriff Hines engaged in retaliation based on Keeley's participation in activities protected by the First Amendment; COUNT II alleged a violation of the Fourteenth Amendment's Equal Protection Clause; COUNT III alleged a deprivation of a property interest without due process of law in violation of the Fourteenth Amendment; and COUNT IV alleges a deprivation of Keeley's liberty interest in violation of the Fourteenth Amendment's due process guarantees.

On June 20, 2024, Sheriff Hines filed the DEFENDANT'S MOTION TO DISMISS PURSUANT TO FEDERAL RULE 12(b)(6) (ECF No 7) (the "MOTION TO DISMISS"). The Plaintiff contested the Motion to Dismiss on COUNTS I and IV, but agreed to the dismissal of COUNTS II and III. On September 5, 2024, the Court entered an ORDER (ECF No. 24) that granted the Motion to Dismiss with respect to COUNTS II and III and denied the Motion to Dismiss with respect to COUNTS I and IV.

---

[1] Section 1982 creates no claims but does allow the prosecution in federal court of claims alleging violations of federal constitutional or statutory rights.

After the completion of discovery, Sheriff Hines filed the MOTION and asked the Court to grant summary judgment on COUNTS I and IV. The largely undisputed materials that are necessary to decide whether the MOTION should be granted on COUNTS I and IV, are illustrated by the exhibits and deposition testimony in this case.

## II. FACTUAL BACKGROUND

### A. Keeley's Employment as a Sheriff Deputy

Keeley began working as a deputy sheriff in January 2010. Def. Ex. A. Pl.'s Resp. to Def's Req. for Admis. ("RFA") No. 1. Keeley primarily worked in the Uniform Patrol Division as a "typical police officer," who conducts traffic stops and responds to calls for services, and also worked as a "field training officer," who supervises the training of newly on-boarded deputy officers. Def. Ex. C. Pl. Dep. at 16:2-21; 18:11-23. After starting his employment, Keeley signed an "Oath and Qualification of Sheriff's Deputy." Def. Ex. B. Keeley re-signed his oath on December 10, 2019 (the "Oath") for the term of January 1, 2020, to December 31, 2023. Def. Ex. D.

Under his Oath, Keeley acknowledged that he was subject to the executive orders that the Defendant issued in his role as the Sheriff of Hanover. Def. Ex. C. Pl. Dep. at 27:17-28:11. Keeley understood these executive orders as "rules and regulations," "policies," or otherwise as "an order from the sheriff, and we're

3

expected to be governed accordingly." Id.

In response to COVID-19, Sheriff Hines issued a series of executive orders. On August 26, 2021, Sheriff Hines issued Executive Order #21-11 (Def. Ex. F) to all Hanover County Sheriff's Office ("HCSO") personnel. Executive Order #21-11 stated:

> At present, the CDC recommends that all employees wear a mask/face-cover indoors when in common areas or while working with others. In regard to face coverings, on-duty personnel shall wear an approved face covering (see below):
>
>> 1.    When working in a health or long-term care facility.
>>
>> 2.    When entering a facility or building, whether privately or publicly owned, that is posted face coverings are required.
>>
>> 3.    When entering a Hanover County Public School building . . .
>>
>> 4.    When responding to a location where they have knowledge that occupations are possibly infected (e.g., ECC house-watch).
>>
>> 5.    When deemed appropriate by the employee.

Def. Ex. F.

On January 10, 2022, Sheriff Hines issued Executive Order #22-01 (Def. Ex. G), which contained the same language as Executive Order #21-11 (Def. Ex. F), and required all on-duty HCSO personnel to wear masks in the enumerated circumstances. Keeley does not dispute that Executive Orders #21-11 and #22-01 (the "Executive Orders") applied to him while he was employed by the HCSO. Def. Ex. C. Pl. Dep. at 31:5-8; 36:15-20. Keeley further acknowledges

that he was subject to the "Rules & Regulations" that Sheriff Hines had implemented while he was employed. Id. at 78:2-13. The June 2021 version of the HCSO Rules & Regulations (Ex. H) stated: "Insubordination - Series 26 Number 1[:] Officers shall promptly obey any lawful orders of a supervisor. This will include orders relayed from a supervisor by an officer of the same or lesser rank." Def. Ex. H. at 11.

## B. Keeley Communicates Beliefs to Sheriff Hines

In 2021, Keeley and Sheriff Hines had a conversation at a firing range facility operated by the HCSO. Def. Ex. C. Pl. Dep. at 108:23-112:1. During that conversation, Keeley informed Sheriff Hines that he had attended the January 6, 2021 protest in Washington, DC. Id. at 113:2-15. Keeley reports that he also specifically informed Sheriff Hines that he disagreed with wearing a mask and did not believe that he should comply with any mask-wearing requirement. Id. at 108:23-113:15; 115:7-14.

## C. Keeley's Refusals to Wear a Mask

On December 31, 2021, Keeley was on duty when he answered a call for service at the Hanover Emergency Center. At that time, Keeley understood that the Hanover Emergency Center had a policy requiring individuals to wear a mask while inside the facility. Id. at 40:1-3. Keeley did not comply with that requirement. Def. Ex. A. RFA No. 11. So, a doctor working at the hospital asked Keeley to put on a face mask and, when Keeley refused, the Doctor

informed Keeley that, under the hospital's policy, masks were required. Id. RFA Nos. 12-13; Def. Ex. K; Def. Ex. C. Pl. Dep. at 41:9-19. Keeley continued to refuse. Def. Ex. K. The doctor then called Keeley's supervisor, Sergeant Regina Murphy, to complain about Keeley's refusal. Id. The doctor and Sergeant Murphy came to an agreement that another deputy would replace Keeley at the hospital. Id. Keeley admits that his conduct in refusing to wear a mask at the Hanover Emergency Center violated the Executive Orders. Def. Ex. C. Pl. Dep. at 55:5-56:6. On February 25, 2022, Sergeant Murphy wrote a memorandum (Ex. K) covering the Hanover Emergency Center incident.

Later, on February 13, 2022, Keeley was on duty as a field training officer for a probationary deputy named Derek Healy ("Deputy Healy"). Def. Ex. C. Pl. Dep. at 52:6-10; Def. Ex. A. RFA Nos. 29-30. Sergeant Lowell Lantz asked Keeley to relieve fellow officers who were working at the Memorial Regional Medical Center ("Memorial Regional"). Def. Ex. A. RFA No. 22. Keeley admits that it was Memorial Regional's policy that everyone in the emergency room had to wear a face covering or mask. Id. RFA No. 27. Keeley informed Sergeant Lantz that he would not wear a mask, stating: "[i]f you put me down there, I am not wearing a mask." Id. RFA Nos. 23-25. Sergeant Lantz responded that "he didn't have a choice" because of staffing shortages for Sheriff Hines' patrol deputies that day. Def. Ex. C. Pl. Dep. at 46:13-14. Sergeant Lantz reminded

6

Keeley "that HCSO policy required [Plaintiff] to wear a mask for this assignment at Memorial Regional," and that "it was the policy of Memorial Regional that everyone in the emergency room wear a face covering or mask." Def. Ex. A. RFA Nos. 25-27. Keeley reported to Memorial Regional with Deputy Healy. Id. RFA No. 29-31. Keeley did not wear a face mask upon entering. Id. A nurse approached Keeley and spoke with him about his failure to wear a mask. Id. RFA No. 32. Deputy Healy then asked Keeley if they were required to wear a mask. Id. RFA No. 33. Keeley responded "technically" yes, and Deputy Healy put on a mask. Id. RFA No. 33-35. Keeley did not wear a face mask at any time while at Memorial Regional. Id. RFA No. 36. Later that day, Sergeant Lantz went to Memorial Regional and observed that Keeley was not wearing a mask while in the hospital's emergency room. Id. RFA No. 38.

### D. Investigation into Refusals

At the direction of Sergeant Lantz, Keeley wrote a February 14, 2022 Memorandum (Def. Ex. N) ("February 14 Memorandum") in which he described the February 13 Memorial Regional incident. In the February 14 Memorandum, Keeley stated that his "actions were in accordance with my clear and outspoken position on this issue with my chain of command for over a year." Def. Ex. N.

The following day, Sergeant Lantz wrote a memorandum (Ex. O) to Lieutenant C. Scott Wooddy, who was Keeley's shift Lieutenant at the time. Lieutenant Wooddy then wrote a memorandum (Ex. P) to

7

Captain Kirk Shaffier requesting an internal investigation into Keeley's conduct as constituting "Insubordination" and "Failure to Supervise."

On February 25, 2022, Keeley met with Sheriff Hines about the Hanover Emergency Center and Memorial Regional incident. Def. Ex. A. RFA No. 47. Sheriff Hines asked Keeley if he "would wear a mask or not," to which Keeley responded that he "could not wear a mask because of [his] personal convictions." Id. RFA Nos. 47-49. Sheriff Hines placed Keeley on administrative suspension with pay pending an internal investigation. Id. RFA No. 50.

The internal investigation was conducted by Lieutenant Jonathan Jones, who issued a new report (Def. Ex. R) containing the results of the investigation. This report found that on February 13, 2022, Keeley had violated Sheriff Hines policies and procedures regarding insubordination, supervision during field training, and the Executive Orders. Def. Ex. R. Keeley does not contest these findings. Upon review of the report, Major Kenny Epling, who was in charge of the Uniform Patrol Division, issued a new memorandum (Def. Ex. S) recommending "3 days of suspension without pay and a written reprimand" contingent upon Keeley "agreeing to follow Sheriff's Office policies related to mask-wearing," and termination if Keeley continued to refuse to wear a mask when required by the Executive Orders. Def. Ex. S.

### E. Termination by Sheriff Hines

After the completion of the investigation, Keeley met with Sheriff Hines and Lieutenant Colonel Thomas Woody on March 3, 2022. Sheriff Hines advised Keeley during this meeting that he agreed with Major Epling's recommendation if Keeley would conform to the Executive Orders. Def. Ex. C. Pl. Dep. at 63:24-64:6. Keeley informed Sheriff Hines that he "had personal convictions about wearing a mask and that he was not going to change his beliefs" and that he saw "no way to change [his] personal convictions in reference to wearing a mask per the HCSO Executive Order[]." Def. Ex. A. RFA Nos. 55, 58. Sheriff Hines asked Keeley if he would wear a mask "in a medical facility or a business that required the wearing of a mask for entry," to which Keeley responded he would not. Id. RFA Nos. 59-60.

Sheriff Hines terminated Keeley that same day, March 3, 2022. Sheriff Hines then wrote a memorandum (Def. Ex. T) (the "March 3 Memorandum") to Keeley, in which he stated that Keeley was being terminated based on the internal investigation and Keeley's "acknowledgment [that he] do[es] not intend to abide by our policies and procedures." Keeley signed the memorandum and acknowledged having received and reviewed it. Def. Ex. T. The following day, Lieutenant Colonel Woody drafted the March 4, 2022 memorandum (Def. Ex. V) summarizing the meeting from the previous day.

9

**F. After the Termination**

At some point between March 3 and 19, 2022, Keeley informed his personal fitness coach, Mike Harman, that he had been terminated by Sheriff Hines because of his "unwillingness to wear a mask or face covering." Ex. A. RFA No. 70. On March 19, 2022, Harman wrote an email (Def. Ex. X) to Lieutenant Colonel Woody and asked that the email be forwarded to Sheriff Hines. In that email, Harman stated that he opposed the termination based on Keeley's "unwillingness to wear a mask[,]" and that he expected "there to be a list of progressive disciplinary actions taken against [Keeley]." Def. Ex. X. The email was forwarded to Sheriff Hines, who responded in a letter on March 22, 2022 (the "March 2022 Letter") (Def. Ex. Y), which, in pertinent part, stated:

> . . . As I am sure you are fully aware, I cannot, nor would I, discuss an individual's personnel records outside the scope allowed me by law. **You** are correct, **you** clearly **do not know all the details.** I do, however, appreciate your helping [Plaintiff] and his family. You should know [Plaintiff] continues to have many friends within the Sheriff's Office willing to help him and his family, including me . . . . Lastly, your subject line was titled "Very Concerned." Please know I too was very concerned. **I also took an oath** for the office of Sheriff and **have an obligation** to the citizens of Hanover County **to ensure that all policies, procedures and laws are followed and enforced without due regard to personal or political beliefs.** This extends not only to me but to those individuals that have sworn the same.

Def. Ex. Y (emphasis added). Sheriff Hines sent copies of the March 22 Letter to Lieutenant Colonel Woody and the Assistant Hanover County Attorney assigned to work with the Sheriff's Office, Leah

Han, on the communication. Id. When deposed, Harman stated that he "didn't go into too much detail" when speaking with Keeley about the Memorial Regional incident, and stated he knew "none" or "very little" about that incident when writing the email to Sheriff Hines. Def. Ex. W. Harman Dep. at 13:5-15:18.

### G. Employment by Caroline County Sheriff's office

On March 7, 2022, Keeley applied for a position as deputy sheriff with Caroline County Sheriff's Office ("CCSO"). Def. Ex. Z. In his application, Keeley stated he was "terminated" by the HCSO for his "refusal to comply with COVID-19 mask policy." Id. at 2, 8. On March 15, 2022, a background investigator with the CCSO, Sergeant K.H. Eichenmiller, came to the HCSO to conduct a background check on Keeley, and Keeley's Internal Affairs ("IA") file was made available for review. Def. Ex. BB.

On March 21, 2022, Sergeant Eichenmiller sent Sheriff Tony Lippa a letter (Def. Ex. CC) summarizing his investigation into Keeley. In this letter, Sergeant Eichenmiller noted that (as Keeley had reported) that he had been terminated from the HCSO for the Memorial Regional incident but also reported that the background check revealed "no other information of pertinent value." Def. Ex. CC. Keeley was then offered employment with the CCSO, and began work as a deputy on April 24, 2022. Def. Ex. C. Pl. Dep. at 20:10-23.

## DISCUSSION

### I.   Legal Standard

A movant is entitled to summary judgment upon showing "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" Libertarian Party of Virginia v. Judd, 718 F.3d 308, 313 (4th Cir. 2013) (quoting Dulaney v. Packaging Corp. of Am., 673 F.3d 323, 330 (4th Cir. 2012)). When deciding a motion for summary judgment, the Court must construe the facts and draw all reasonable inferences "in the light most favorable to the nonmoving party." Id. at 312-13. However, the non-movant must provide more than "a scintilla of evidence" to overcome a summary judgment motion. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). Sheriff Hines moves for summary judgment on the Plaintiff's two remaining claims, COUNT I and COUNT IV.

### COUNT I: First Amendment Retaliation

COUNT I of the COMPLAINT makes a claim for First Amendment Retaliation. Compl. ¶ 36. Keeley alleges that he was exercising his rights under the First Amendment in opposing both Sheriff Hines' mask-wearing policy and mask-wearing policies in general, and that his First Amendment rights were violated when Sheriff Hines terminated him allegedly in retaliation for engaging in what Keeley contends to have been protected speech. Compl. ¶ 38.

## I.   Legal Standard

The First Amendment right to free speech covers not only the affirmative right to speak, but also the right to be free from retaliation by a public officer for exercising that right. Suarez Corp. Indus. v. McGraw, 202 F.3d 676, 685 (4th Cir. 2000). "However, not every reaction made in response to an individual's exercise of his First Amendment right to free speech is actionable retaliation." Id. (citing DiMeglio v. Haines, 45 F.3d 790, 806 (4th Cir. 1995) ("Not every restriction is sufficient to chill the exercise of First Amendment rights, nor is every restriction actionable, even if retaliatory.")). The standard for proving a claim for First Amendment retaliation becomes more stringent when the plaintiff is a public employee because a citizen who accepts public employment "must accept certain limitations on his or her freedom." Liverman v. City of Petersburg, 844 F.3d 400, 406 (4th Cir. 2016) (citing Garcetti v. Ceballos, 547 U.S. 410, 418, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006)).

To state a claim under the First Amendment for retaliatory discharge, a plaintiff must satisfy the three-faceted test set forth by the Fourth Circuit in McVey v. Stacy, 157 F.3d 271 (4th Cir. 1998). "In particular, the plaintiff must show: (1) that he was a 'public employee ... speaking as a citizen upon a matter of public concern [rather than] as an employee about a matter of personal interest;' (2) that his 'interest in speaking upon the

13

matter of public concern outweighed the government's interest in providing effective and efficient services to the public;' and (3) that his 'speech was a substantial factor in the employer's termination decision.'" Grutzmacher v. Howard Cnty., 851 F.3d 332, 342 (4th Cir. 2017) (citing McVey, 157 F.3d at 277-78).

## II. Analysis

For Keeley's First Amendment Retaliation claim to survive summary judgment, Keeley must demonstrate, at the least, a genuine dispute of material fact as to each of the three elements required by McVey. The Court finds that Keeley's First Amendment Retaliation claim fails because he has not shown the required causal nexus between the alleged protected speech and Sheriff Hines' decision to terminate Keeley's employment. The Court will only address the causation element, as it is dispositive of the claim.

The analysis begins with the principle that a legally sufficient claim for First Amendment retaliation "requires a determination that the employee's speech caused the disciplinary action." Crouse v. Town of Moncks Corner, 848 F.3d 576, 583 (4th Cir. 2017) (citing McVey, 157 F.3d at 277-78). So, a plaintiff pursuing a First Amendment retaliation claim must show that the defendant "took an 'adverse action' in response to his speech that 'would not have been taken absent the retaliatory motive.'" Houston Cmty. Coll. Sys. v. Wilson, 595 U.S. 468, 469, 142 S. Ct. 1253, 1255, 212 L. Ed. 2d 303 (2022) (quoting Nieves v. Bartlett, 587 U.

14

S. 391, 139 S.Ct. 1715, 204 L.Ed.2d 1 (2019)). "'[I]t is not enough that the protected expression played a role or was a motivating factor in the retaliation; claimant must show that 'but for' the protected expression the [state actor] would not have taken the alleged retaliatory action.'" Porter v. Bd. of Trustees of N. Carolina State Univ., 72 F.4th 573, 583 (4th Cir. 2023) (quoting Raub v. Campbell, 785 F.3d 876, 885 (4th Cir. 2015)).

The evidence in the record shows that, even when taken in the light most favorable to Keeley, there is no but-for causation between the speech on which COUNT I is based and Sheriff Hines' decision to terminate Keeley. The March 3 Memorandum, prepared on the day that Keeley was terminated, stated that the HCSO had completed an internal investigation into Keeley following the two incidents (Hanover Emergency Center and Memorial Regional) and that these incidents "constituted violations of the Rules and Regulations, as well as the Policies and Procedures of the [HCSO]." Def. Ex. T. The March 3 Memorandum reflected that Keeley "expressed" during the meeting that he did "not intend to abide by the Policies and Procedures of the Hanover County Sheriff's Office." Id. Sheriff Hines then stated:

> After reviewing the results of this investigation along with your acknowledgement you do not intend to abide by our policies and procedures, it is my decision, as well as the collective decision of the staff, that your employment with the Hanover County Sheriff's Office be terminated effective March 3, 2022.

15

*Id.* Keeley signed this memorandum and acknowledged that he both had read it and received a copy of it. *Id.* The statements made in the termination letter reflect that the reason that Keeley was terminated was the "acknowledgment" that he did "not intend to abide by our policies and procedures," namely the Executive Orders requiring that a mask be worn in specific circumstances. *Id.* Keeley's own testimony confirms that Sheriff Hines terminated him because of his refusal to wear masks in accordance with the Executive Orders and not because Keeley had participated in any protected speech. Keeley testified to the following at his deposition:

> Q Do you recall when Sheriff Hines asked you if you would wear a mask going forward?
> A In the final interview?
> Q (Mr. Prince is nodding head.)
> A Yes.
> Q Do you think you would have kept your job if you had said yes?
> A I do.

Def. Ex. C. Pl. Dep. at 79:17-24. Keeley's testimony thus confirms that the but-for cause of the termination was not his alleged speech.

On March 3, 2022, Sheriff Hines informed Keeley that he would be able to remain a deputy sheriff, if he agreed to follow the Executive Orders while on duty. *Id.* at 63:2-28; 65:7-66:13 (Keeley stating that his continued employment was "contingent" upon him agreeing to wear a mask moving forward, to which he stated "I'm

16

not going to do that.). Keeley refused, and because of this refusal he was terminated. Id. at 65:7-66:13; 149:6-17. The record establishes that Sheriff Hines afforded Keeley the opportunity of continued employment, the alleged protected speech notwithstanding, if going forward he complied with the policies and procedures of the HCSO. Taking the evidence in the light most favorable to Keeley, there is no genuine dispute of material fact on the issue of causation and COUNT I will be dismissed.

Keeley argues that the Court should not accept that the reason that Keeley was terminated was his refusal to wear a mask because the violations of the Executive Orders were used a pre-text to terminate him for his alleged speech. ECF No. 36 at 13-14. The alleged support for that view is that: (1) Sheriff Hines had knowledge of Keeley's "outspokenness" about masks through his February 14 memorandum and the conversation at the firing range; (2) Sheriff Hines "necessarily" considered this speech in his decision to terminate Keeley; (3) Sheriff Hines did not report Keeley to the Viriginia Department of Criminal Justice for decertification under Va. Code § 15.2-1707(B)(vi); and (4) Sheriff Hines gave Keeley a positive job recommendation after his termination. Id. Keeley posits that those facts lead to the conclusion that: "(i) Hines' stated reason for termination is false; and (ii) the true reason for Hines' decision to terminate Keely centered on his outspoken (and broad-based) opposition to

wearing masks[.]" Id. at 14. That conclusion does not follow from the evidence in this case.

First, Keeley argues that Sheriff Hines' had knowledge of his general "outspokenness" against masks, and that knowledge informed his decision to terminate Keeley. ECF No. 36 at 13-14. However, even if the Court is to assume that Sheriff Hines had knowledge of Keeley's outspokenness against masks, that does not provide the basis for a reasonable and logical inference that the decision to terminate Keeley by Sheriff Hines' was based on that knowledge. Keeley's argument lacks any support from the record to show a "retaliatory motive" springing from Sheriff Hines' assumed knowledge of Keeley's outspokenness. Houston Cmty. Coll. Sys., 595 U.S. at 477.

Relatedly, Keeley argues that Sheriff Hines' mere knowledge about Keeley's "outspokenness" against masks shows that Sheriff Hines' "necessarily" used that knowledge when deciding to terminate Keeley. ECF No. 36 at 14. That argument depends entirely on the word "necessarily" which is both conclusory and speculative where, as here, the record supplies no evidence that Sheriff Hines' knew of the alleged outspokenness.

Second, the record, including Keeley's own testimony, contradicts the view that Sheriff Hines was using Keeley's insubordination and refusal to comply with the Executive Orders as a pre-textual reason to terminate him. As discussed above, Keeley

18

testified at his deposition that Sheriff Hines offered him continued employment if he would comply with the Executive Orders. Def. Ex. C. Pl. Dep. at 79:17-24. Keeley does not explain how the offer of retained employment could be a pre-text for terminating that employment. It is neither reasonable nor logical to infer otherwise.

Finally, the evidence that Sheriff Hines gave Keeley a positive recommendation neither logically nor reasonably permits a conclusion that Sheriff Hines had a retaliatory motive when firing Keeley. To the contrary, that evidence rather clearly establishes that Sheriff Hines lacked any such retaliatory motive in terminating Keeley. Houston Cmty. Coll. Sys., 595 U.S. at 477 (requiring plaintiffs to prove that "an 'adverse action' in response to [protected speech] 'would not have been taken absent the retaliatory motive.'") (internal citations omitted). This same logic applies to Sheriff Hines' decision not to refer Keeley to the Virginia Department of Criminal Justice for decertification under Va. Code § 15.2-1707(B)(vi).

COUNT IV: LIBERTY INTEREST AND DUE PROCESS

## I.   Legal Standard

The Fourteenth Amendment provides that no "State [shall] deprive any person of life, liberty, or property without due process of law." U.S. Const. amend. XIV. Courts "pose two questions when reviewing a claimed procedural due process violation: '[T]he

19

first asks whether there exists a liberty or property interest which has been interfered with by the State, the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient.'" Slade v. Hampton Roads Reg'l Jail, 407 F.3d 243, 253 (4th Cir. 2005) (citing Ky. Dep't of Corr. v. Thompson, 490 U.S. 454, 460, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989)).

Keeley's Fourteenth Amendment claim is that the March 2022 Letter deprived him of a liberty interest "with respect to his good name, reputation, honor and integrity." Pl.'s Compl. ¶¶ 25-33, 53. Keeley, as a public employee, has "a Fourteenth Amendment liberty interest [that] is implicated by public announcement of reasons for an employee's discharge." Sciolino v. City of Newport News, 480 F.3d 642, 645-46 (4th Cir. 2007) (quoting Johnson v. Morris, 903 F.2d 996, 999 (4th Cir. 1990)). "To state this type of liberty interest claim under the Due Process Clause, a plaintiff must allege that the charges against him: (1) placed a stigma on his reputation; (2) were made public by the employer; (3) were made in conjunction with his termination or demotion; and (4) were false." Id. (citing Stone v. Univ. of Md. Med. Sys. Corp., 855 F.2d 167, 172 n. 5 (4th Cir.1988)). After making this showing, the employee "must demonstrate that [his] liberty was deprived without due process of law." Cannon v. Vill. of Bald Head Island, N. Carolina, 891 F.3d 489, 501 (4th Cir. 2018) (quoting Segal v. City

of N.Y., 459 F.3d 207, 213 (2d Cir. 2006)).

## II. Analysis

For Keeley's liberty interest claim to survive summary judgment, Keeley must demonstrate the existence of a genuine dispute of material fact as to each of the four elements required by the Fourth Circuit in Sciolino. The second and fourth elements of Sciolino provide an independent and sufficient ground each for granting summary judgment on COUNT IV (the liberty interest claim). Each will be addressed in turn.

## A. Public Disclosure

The first task is to determine whether the sending of the March 2022 Letter (Def. Ex. Y) to Harman constituted a sufficient public disclosure within the meaning of Sciolino. The Fourth Circuit has held that "plaintiffs must plead more than the simple act of making derogatory information available; they must prove that information is 'likely to be inspected by prospective employers.'" Elhady v. Kable, 993 F.3d 208, 226 (citing Sciolino, 480 F.3d at 649). A "private communication . . . cannot properly form the basis for a [liberty interest] claim." Fuller v. Laurens Cnty. Sch. Dist. No. 56, 563 F.2d 137, 141 (4th Cir. 1977). Instead, this element requires "some type of dissemination or publication of the statement." Elhady, 993 F.3d at 225.

Here, Sheriff Hines addressed the March 2022 letter to Harman, and copied Lieutenant Colonel Woody and Leah Han, his attorney, on

the communication. Def. Ex. Y. There is no evidence that the letter was circulated further. Here as in Elhady, Keeley does "not point to specific instances where private employers looked at this evidence or made employment decisions based on it." Id. The only individuals to whom the March 2022 Letter was disclosed were Harman, Leah Han, and Lieutenant Colonel Woody. Keeley rightly does not contend that the intragovernmental dissemination of the March 2022 Letter to Leah Han and Lieutenant Colonel Woody constitutes a public disclosure. See ECF No. 36 at 17 fn. 3; Elhady, 993 F.3d at 225 ("[I]ntragovernmental dissemination . . . is not 'public disclosure'") (internal citations omitted)). There is also no dispute over the fact that Harman does not constitute a prospective employer as a retired firefighter and current gym owner. Def. Ex. W. Harman Dep. at 8:3-19. The sending of the March 2022 Letter to a single individual, Harman, without any evidence that it was shared beyond Harman does not render the March 2022 Letter likely to be inspected to any employers. See, e.g., Smith v. Wright, No. 2:19CV559, 2021 WL 11474540, at *6 (E.D. Va. Apr. 12, 2021) (Rep. & Rec.) (Krask, J.) (noting that the publication element requires a plaintiff to allege that the false statement "had actually been made public or disseminated to prospective employers, or that a likelihood exists that such charge will be disseminated to the public at large or potential employers.") (citations omitted). And, there is no evidence that the March 22

Letter was so distributed.

Keeley argues that the March 2022 Letter was placed in the HCSO Internal Affairs ("IA") file and that this placement in the IA file satisfies the publication requirement. That contention misconstrues the deposition testimony of Sheriff Hines and does not consider the declaration filed by Captain Jones. When asked where the March 2022 Letter was stored, Sheriff Hines testified in his deposition to the following: "I don't know the answer to that. I think it's in the Internal Affairs file, but I don't know that to be factual." Pl. Ex. C. Sheriff Hines Dep. at 153:15-20. Sheriff Hines went on to testify that "Ms. Scott" and "Captain Jones" would know where the document was stored. Id. at 153:8-13; 153:21-154:2. Neither of these individuals were deposed to answer this question. However, Captain Jones has signed a declaration in which he stated that the March 2022 Letter "was not placed in [Plaintiff's] personnel file or his internal affairs paper file." Def. Ex. Q, Jones Decl. ¶ 10. Thus, Sheriff Hines' deposition testimony does not create a genuine dispute of material fact as to whether the March 2022 Letter was publicly disclosed or that there is an off chance, despite evidence to the contrary, that the March 2022 Letter was placed in the IA file. Sciolino, 480 F.3d at 650 ("a plaintiff must allege more than his file 'may be available' to a prospective employer").

**B. Falsity**

The fourth <u>Sciolino</u> element asks whether the March 2022 Letter contained a false statement. Keeley argues that the March 2022 Letter contains a falsity because it insinuated that Keeley was terminated for violating "multiple" policies, violating laws, and violating his oath as a law enforcement officer. ECF No. 36 at 18-19. Keeley testified during his deposition that:

> Q And where in the letter does Sheriff Hines say something that you contend is false?
>
> A I would contend that it's **creating a false impression,** it's deliberately creating a false impression. **I'm not saying that there's a word there that I can point to that is false.** He says, You don't know all the details and the inferences. He doesn't know exactly what I was fired from. He may not know -- I agree, Mike Harman may not know that it stems from an incident that occurred on X date, but -- so you could say, well, factually, there's nothing wrong there, but it **creates an inference that is false.**

Def. Ex. C, Keeley Dep. at 131:5-17. The statement that "well, factually, there's nothing wrong there" works as an effective concession that Keeley's only route to finding a falsity is through an inference that the March 2022 Letter falsely implied the reasons for Keeley's termination. During the hearing on the summary judgment motion on April 22, 2025, Keeley conceded that the false implication should be narrowed to that of an implication that Keeley violated the laws that Sheriff Hines is responsible for enforcing.

The record does not find that the March 2022 letter contains any false statements. Nor does the record permit an inference that

it contains false implications. It is true that Sheriff Hines, as Sheriff, is responsible for enforcing the policies and procedures of his office and the laws. It is also true, according to Harman's own deposition testimony, that Harman was not made aware of the full reasons behind Keeley's termination. See Def. Ex. W. Harman Dep. at 14:6-15:18 (Harman stated that Keeley did not "go into too much detail" about the incidents leading to his termination, and that Harman knew "none, honestly" about the hospital incident).

Further, even the possible insinuation that Keeley was terminated for violations of multiple policies and procedures of the HCSO and his Oath as a deputy is not a false statement. Keeley does not dispute that he violated Sheriff Hines' executive orders on mask mandates twice, that he violated the terms of the field training program, and that the internal affairs investigation concluded that he committed insubordination. See ECF No. 36 at 2 (stating that he has "No Dispute" to each of these factual assertions by the Defendant). Thus, there is no dispute that Keeley violated the policies and procedures of Sheriff Hines. It is also not in dispute that Keeley's Oath as a deputy of the HCSO required him to comply with the policies and procedures of Sheriff Hines, and that he was in violation of this Oath through refusing to comply with the Executive Orders. Id.

This leaves one theory to support Keeley's contention of falsity: the implication that Keeley violated the laws that Sheriff

Hines is responsible for enforcing. To begin, the March 22 Letter contains no direct assertion that Keeley was in violation of any laws. Even when viewing the March 2022 Letter in the light most favorable to Keeley, it is neither logical nor reasonable to infer that Sheriff Hines was making a statement that Keeley had violated any law. No reasonable jury could find otherwise.

Therefore, Keeley's liberty interest claim fails because there are no genuine disputes of material facts as to the second element (public disclosure) and the fourth element (falsity) of Sciolino, and the Court will grant summary judgment on COUNT IV.[2]

### CONCLUSION

For the foregoing reasons, the DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (ECF No. 31) will be granted as to COUNT I and COUNT IV.

It is so ORDERED.

                             /s/    REP
                        Robert E. Payne
                        Senior United States District Judge

Richmond, Virginia
Date: April 29, 2025

---

[2] The Court will not address the qualified immunity defense because the defense is predicated upon an initial showing "that the official violated a statutory or constitutional right," and the Court has found that no underlying constitutional claims survive this summary judgment motion. Cannon, 891 F.3d at 497 (citation and internal quotation marks omitted).